IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

SIMPLY WIRELESS, INC.,        )
        )
      Plaintiff,        )
        )
v.        )    Civil Action No. 1:21-cv-00597 (AJT/JFA)
        )
T-MOBILE US, INC.,        )    **Public Version**
*formerly known as*        )
*T-Mobile USA, Inc.*, *et al.*,        )
        )
      Defendants.        )
_____)

## <u>MEMORANDUM OPINION AND ORDER</u>

This long-running trademark dispute concerns the ownership of the mark SIMPLY PREPAID ("the Mark"). Plaintiff Simply Wireless, Inc. ("Plaintiff" or "Simply Wireless") first used the Mark in commerce in 2002 and continued to use the Mark through 2008, at which time it discontinued using the Mark based on its assessment of an industry-wide shift in the market away from prepaid airtime for mobile phones. Defendants T-Mobile US, Inc. and T-Mobile USA, Inc.'s ("Defendants" or "T-Mobile") first use of the Mark in commerce began in June, 2014, soon after which T-Mobile filed for registration of the Mark in August, 2014. Following the discontinuation of its use of the Mark beginning in 2009, Simply Wireless did not again use the Mark until July 31, 2012, over three-and-a-half years later, and then only until April 25, 2013, on a different platform and with limited sales. In sum, Simply Wireless used the Mark in only essentially nine of the approximately sixty-five months that preceded T-Mobile's first use and registration application and then only in a transitory, limited, and economically marginal manner.

After learning of T-Mobile's use of the Mark in August, 2014, Simply Wireless filed its own application for registration of the Mark on October 2, 2014, and then again began using the

Mark in connection with the sale of products a year later, on October 4, 2015, with sales substantially ceasing by the end of 2016 and altogether by March 31, 2018. Since 2019, Simply Wireless's use of the Mark remains completely nonexistent. On the other hand, since it first introduced the Mark, T-Mobile's use has been consistent and prominent.

In this action, Simply Wireless alleges that T-Mobile has infringed its common law ownership of the SIMPLY PREPAID mark; and based on that contention has asserted claims for: (1) trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114 (Count I); (2) trademark infringement under Virginia Code § 59.1-92.12 (Count II); (3) unfair competition, passing off, trade name infringement, trademark infringement and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III) and the common law (Count IV); and (4) trademark dilution under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(a) (Count V). *See* [Doc. No. 1] ("Compl.").[1] In response, T-Mobile contends that since Simply Wireless discontinued its use of the SIMPLY PREPAID mark prior to T-Mobile's first use of the Mark, it now has priority over the Mark's use.[2] Plaintiff and Defendants have filed cross motions for summary judgment. [Doc. Nos. 184, 189] (together, the "Motions for Summary Judgment").[3]

---

[1] Plaintiff requests the following relief: (1) that Defendants be enjoined from using the trademark SIMPLY PREPAID or any other trademark beginning with SIMPLY for any telecommunications goods or services, including, but not limited to, any of the goods or services identified in T-Mobile's pending applications at the USPTO; (2) an order that T-Mobile be required to provide and deliver to the Court for destruction all materials that use the trademark SIMPLY PREPAID; (3) Simply Wireless be awarded damages; (4) a finding that the case is "exceptional" due to T-Mobile's alleged willful and deliberate infringement of Plaintiff's rights and an award of enhanced damages, reasonable attorney's fees, and other litigation expenses; (5) punitive damages; (6) a directive to the USPTO that it incorporate a judgment of trademark infringement against T-Mobile as part of the contents of its pending trademark applications; (7) a determination that T-Mobile is not entitled to registration of pending trademark applications and that an order refusing registration of the pending applications be certified to the USPTO Director; (8) a determination that Simply Wireless's pending application is in condition for publication and an order certifying publication to the USPTO Director; and (9) any further relief the Court deems just and appropriate.
[2] T-Mobile has filed Counterclaims [Doc. No. 11], in which it seeks (1) an order directing the USPTO to cancel registration of Plaintiff's SIMPLY WIRELESS trademarks under 5 U.S.C. § 1119 (Count I); (2) an order directing the USPTO to cancel Plaintiff's Application Serial No. 86/412,692 under 5 U.S.C. § 1119 (for the mark SIMPLY PREPAID) (Count II); and (3) a declaratory judgment as to its rights in the SIMPLY PREPAID mark (Count III).
[3] Also pending are (1) Plaintiff Simply Wireless, Inc.'s Motion to Exclude the Expert Report and Testimony of Dr. Naomi Baron, Ph.D. [Doc. No. 180]; (2) Plaintiff Simply Wireless, Inc.'s Motion to Exclude the Expert Report and

As discussed below, this case raises somewhat unresolved issues within the Fourth Circuit concerning the legal standard by which to determine priority ownership of a common law mark. More specifically, the issue is whether Simply Wireless's priority is to be determined by whether its use in commerce was deliberate and continuous, not sporadic, casual or transitory, through the date of T-Mobile's first use in June, 2014, or, after it had established its common law ownership by its deliberate and continuous use in commerce from 2002-2008, whether it had abandoned the Mark as of T-Mobile's first use in June, 2014.

Upon consideration of the Motions for Summary Judgment, the memoranda submitted in support thereof and in opposition thereto, the arguments presented by counsel at the hearing held on February 16, 2022, and the supplemental hearing held on April 19, 2022, the Court concludes that an abandonment analysis, rather than a deliberate and continuous use analysis, controls. After applying abandonment principles, the Court further concludes, as discussed below, that there are no genuine issues of material facts; and as a matter of law Simply Wireless had abandoned the Mark prior to the date of T-Mobile's first use in June, 2014 and did not thereafter re-establish common law ownership over the Mark. Accordingly, T-Mobile is entitled to judgment in its favor with respect to Plaintiff's claims as a matter of law. Defendants' Motion for Summary Judgment is therefore GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.[4]

---

Testimony of Theodore Moon [Doc. No. 181]; (3) Plaintiff Simply Wireless, Inc.'s Motion to Exclude the Surveys and Testimony of Hal Poret and Philip Johnson [Doc. No. 182]; (4) Plaintiff Simply Wireless, Inc.'s Motion to Exclude the Expert Report and Testimony of Shirley Webster [Doc. No. 183]; (5) Defendants' Motion to Exclude the Expert Opinions of Mr. Terry Hsu [Doc. No. 185]; (6) Defendants' Motion to Exclude the Expert Opinions of Dr. Simon Blanchard [Doc. No. 186]; (7) Defendants' Motion to Exclude the Expert Opinions of Dr. Natalie Schilling [Doc. No. 187]; and (8) Defendants' Motion to Exclude the Expert Opinions of Mr. Todd W. Schoettelkotte [Doc. No. 188] (together, the "Motions in Limine"). Given the Court's ruling on the Motions for Summary Judgment, the Motions in Limine are hereby DENIED as moot.

[4] Also before the Court are (1) Plaintiff's Motion for Leave to File Hearing Slides and Supplemental Authority [Doc. No. 312] and (2) Defendants' Motion for Leave to File Sur-Reply in Opposition to Plaintiff's Motion for Leave to File Hearing Slides and Supplemental Authority [Doc. No. 327]. The Court has considered the substance of and the attachments to those motions in reaching its decisions set forth herein and those motions will be granted.

# I.   BACKGROUND

The following facts are undisputed unless otherwise noted.[5]

From 1997 through 2009, Simply Wireless offered and sold third-party cell phones and accessories through its SIMPLY WIRELESS brick and mortar retail stores. *See* [Doc. No. 198], (Plaintiff's Statement of Undisputed Facts (hereinafter "PUF")), ¶ 3.[6] Beginning in 2009, Simply Wireless either closed its brick and mortar locations using the name SIMPLY WIRELESS or converted them to exclusive Sprint dealerships, which were operated under the name "Mobile Now." [Doc. No. 256], PUF Response ¶ 3; *see also* [Doc. No. 208], Ex. 24 (S. Qureshi Dep. Tr.) at 78:7-79:6.

Overall, Simply Wireless has not operated a store under the name SIMPLY WIRELESS since 2009, [Doc. No. 209-2], (Defendants' Statement of Undisputed Facts (hereinafter "DUF")), ¶ 1, and from 2010 onwards, did business under the names of other companies other than Simply Wireless and shifted all of its non-brick-and-mortar Simply Wireless channels of sales to those companies. *See* [Doc. No. 209-2], DUF ¶ 2; [Doc. No. 209-11], Ex. 29; [Doc. No. 208], Ex. 24 (S. Qureshi Tr.) at 136:3-139:8. Since 2011, Simply Wireless has not made any sales under, or spent money advertising, the SIMPLY WIRELESS brand. *See* [Doc. No. 209-2], DUF ¶ 2; [Doc. No. 209-11], Ex. 29. Simply Wireless's website www.simplywireless.com was non-operational at a minimum between February 2012 and December 2014, and potentially as early as 2009. *See* [Doc.

---

[5] The parties have filed cross-motions for summary judgment, with separate statements of material and disputed facts. Nevertheless, the parties generally agree on the relevant dates and facts pertaining to priority ownership of the Mark. However, there are certain facts the parties dispute, in particular, those pertaining to Simply Wireless's use of the Mark. Nevertheless, the Court has considered both summary judgment motions based on the record with respect to both as a whole, noting disputes where appropriate.

[6] Defendants dispute this fact, claiming, in part, that the data "does not show sales before 2001 and does not for any year show what products were sold or which sales were unique to physical stores." [Doc. No. 256], PUF Response ¶ 3; *see also* [Doc. No. 209-11], Ex. 29.

No. 209-2], DUF ¶ 3; [Doc. No. 208-2], Ex. 31; [*id.*], Ex. 32; [*id.*], Ex. 37; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) at 82:16-19.

A.  Simply Wireless's Use of the Mark

Simply Wireless does not own a registered trademark for the name "Simply Prepaid." [Doc. No. 209-2], DUF ¶ 4. Simply Wireless has never operated a brick and mortar store under the name SIMPLY PREPAID. [Doc. No. 209-2], DUF ¶ 1; [Doc. No. 246], DUF Response ¶ 1. Since 2002, Simply Wireless owned and maintained the domain name www.simplyprepaid.com ("simply prepaid website"); and from 2002 through 2008, offered pre-paid airtime for cell phones through that website. [Doc No. 198], PUF ¶¶ 4, 9; [Doc. No. 198-1] (Declaration of Steven Qureshi) (hereinafter "S. Qureshi Decl.")), ¶¶ 4, 9, Ex. 5.[7] Between 2002 and 2008, the SIMPLY PREPAID mark generated more than $20 million in revenue for Simply Wireless. [Doc. No. 198], PUF ¶ 5; S. Qureshi Decl. ¶ 5, Ex. 2.[8]

Beginning in 2009, Simply Wireless "paused" its sales through the simply prepaid website based on its assessment of an industry-wide shift away from prepaid refills (like the ones sold through the simply prepaid website). [Doc. No. 198], PUF ¶ 10; S. Qureshi Decl. ¶ 10.[9] Simply Wireless left the simply prepaid website inactive from at least 2009 (when Simply Wireless rebranded its physical stores to Mobile Now) until mid-August 2014. [Doc. No. 209-2], DUF ¶ 8.

---

[7] T-Mobile disputes this fact, contending that Simply Wireless has proffered insufficient evidence to establish (1) that the simply prepaid website was continuously operational from 2002-2008; (2) that sales were continuously made on that website using the Simply Prepaid name; and (3) what products or services were sold through that website. [Doc. No. 256], PUF Response ¶ 4.

[8] However, as T-Mobile points out, the underlying data or records to support this claim are minimal at best. [Doc. No. 332-1], Defs. Slides at 5-8. Moreover, it appears the simply prepaid website operated under a different name, "Prepaid Refills," in 2008. [*Id.*], at 9.

[9] T-Mobile disputes this characterization, contending that Plaintiff completely ceased using the website entirely in 2009, only resurrecting it in December 2014 after becoming aware of T-Mobile's Simply Prepaid store. [Doc. No. 256], PUF Response ¶ 10.

Between 2009 and 2015, Simply Wireless's owners did not use the SIMPLY PREPAID mark in connection with its other companies, including Mobile Now, to which it had shifted both its SIMPLY WIRELESS brick and mortar and non-brick and mortar business, and through those businesses generated hundreds of millions of dollars in revenues without the use of the Mark. [Doc. No. 209-2], DUF ¶ 6; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) at 234:14-22; [Doc. No. 209-11], Ex. 29; S. Qureshi Decl. ¶ 3. From 2002 to 2019, Simply Wireless did, however, display the SIMPLY PREPAID mark at its Virginia office along with the marks of Simply Wireless's other brands. [Doc. No. 198], PUF ¶ 20; S. Qureshi Decl. ¶ 20.[10]

Following the discontinuation of the use of the SIMPLY PREPAID mark in 2009, Simply Wireless did not again use the Mark in commerce until July 31, 2012, when it sold prepaid cell phones through the website toptvstuff.com ("toptvstuff"). [Doc. No. 209-2], DUF ¶ 6; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) at 234:3-13. That use continued from July 31, 2012 to April 25, 2013, earning Plaintiff approximately $15,546 in sales. [Doc. No. 198], PUF ¶¶ 11-14; [Doc. No. 209-2], DUF ¶ 6; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) at 234:3-13; [Doc. No. 209-11], Ex. 29.[11] The revenue from that site was generated from 277 transactions from 44 states; 10 states only accounted for one sale apiece, another 26 states accounted for less than ten sales each, and the remaining 8 states accounted for nearly 50% of the total transactions with the highest number of sales (36) coming from one state. [Doc. No. 198], PUF ¶ 14; S. Qureshi Decl. ¶ 14, Ex. 2; [Doc.

---

[10] T-Mobile disputes this fact, arguing that Plaintiff has failed to put forth evidence establishing that Plaintiff continually displayed the SIMPLY PREPAID mark during the entire 2002 to 2019 period. [Doc. No. 256], PUF Response ¶ 20.

[11] T-Mobile disputes that Plaintiff has proffered any evidence that these sales were under the SIMPLY PREPAID mark. [Doc. No. 256], PUF Response ¶ 14. Plaintiff also contends that during this same period, it used the SIMPLY PREPAID mark through advertisements and other promotional materials, reaching approximately 500,000 consumers in all 50 states. [Doc. No. 198], PUF ¶ 13; S. Qureshi Decl. ¶ 13. T-Mobile again disputes this fact, contending that other than "Mr. Qureshi's self-serving declaration," Plaintiff has not put forth evidence supporting this fact. [Doc. No. 256], PUF Response ¶ 13.

No. 333-1], Pl. Slides at 36. Simply Wireless did not make any sales to customers in 6 states. Simply Wireless also paid $25,000 to market on toptvstuff and paid a commission on each sale made through toptvstuff. [Doc. No. 198], PUF ¶ 15; [Doc. No. 199-1], Ex. 2 (S. Qureshi Tr.) at 152:21-153:8.[12] After Simply Wireless's last sale associated with toptvstuff on April 25, 2013, it took no substantive, public-facing action with respect to using the SIMPLY PREPAID mark until October 2, 2014, when it filed a registration application for the Mark with the United States Patent and Trademark Office ("USPTO"), post-dating T-Mobile's registration application for the Mark, which T-Mobile filed on August 13, 2014. [Doc. No. 209-2], DUF ¶¶ 6, 15.

In December 2014, Simply Wireless "launched" a "revamped Simply Prepaid website." [Doc. No. 198], PUF ¶ 17; S. Qureshi Decl. ¶ 17. Simply Wireless did not, however, begin offering the sale of prepaid cellular phones through the simply prepaid website until 2016. [*Id.*] The last sale Simply Wireless made through the simply prepaid website occurred on March 31, 2018; Simply Wireless then stopped offering the sale of any products through the Simply Prepaid website as of 2019. [*Id.*]; S. Qureshi Decl., Ex. 2 at PageID# 4782; [Doc. No. 209-11], Ex. 29. During that roughly three-year period (2016-2018), Simply Wireless earned approximately $7,000[13] from transactions through the "revamped" Simply Prepaid website. S. Qureshi Decl., Ex. 2.[14]

Simply Wireless did not spend any money advertising the name SIMPLY PREPAID between 2009 and October 2014. [Doc. No. 209-11], Ex. 29; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) at 158:5-9, 231:12-20. In October 2014, Simply Wireless spent $25,000 advertising the Mark

[12] T-Mobile disputes this fact. [Doc. No. 256], PUF Response ¶ 15. While Mr. Qureshi testified that Simply Wireless did not spend any money on advertising in its relationship with toptvstuff, he did testify that Simply Wireless paid "some sort of a bounty." [Doc. No. 199-1], Ex. 2 (S. Qureshi Tr.) 152:21-153:8. Moreover, there is a September 2012 invoice for $25,000 from Ignite Media to Simply Wireless. S. Qureshi Decl., Ex. 8 at SW090338.
[13] Plaintiff only claims to have made $6,500 in Amazon sales but its records indicate the amount is around $7,000. *Compare* S. Qureshi Decl. ¶ 17, *with* [Doc. No. 209-11], Ex. 29; S. Qureshi Decl., Ex. 2.
[14] T-Mobile disputes this fact, citing Plaintiff's failure to provide records establishing these sales. [Doc. No. 256], PUF Response ¶ 17.

on a Petit LeMans Race Car. [Doc. No. 333-1], Pl. Slides at 17; [Doc. No. 209-11], Ex. 29; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) 158:16-159:13, 230:6-231:20; [Doc. No. 208-2], Ex. 39. In May 2015, Simply Wireless spent $10,000 advertising the Mark in connection with the Avon 39 Walk to End Breast Cancer in Washington, D.C. [Doc. No. 333-1], Pl. Slides at 19; [Doc. No. 209-11], Ex. 29; [Doc. No. 208-1], Ex. 24 (S. Qureshi Tr.) 158:16-159:13.

From 2015 to 2016, Simply Wireless generated over $1,000,000 in sales through "Amazon Marketplace" using the SIMPLY PREPAID mark. [Doc. No. 198], PUF ¶ 18; S. Qureshi Decl. ¶ 18; [Doc. No. 209-11], Ex. 29.[15] The first sale through Amazon Marketplace did not occur until October 4, 2015. *See* S. Qureshi Decl., Ex. 2 at PageID# 4785. Simply Wireless has not spent any money advertising the name Simply Prepaid as of 2017 and has not made any sales using the Mark since March 31, 2018. [Doc. No. 209-2], DUF ¶ 5; [Doc. No. 209-11], Ex. 29.

Simply Wireless stopped using the SIMPLY PREPAID mark as of 2019. [Doc. No. 198], PUF ¶ 23, but proffers that since that time, "the family of companies operated by [Simply Wireless's owners] have experienced a temporary business interruption, but Simply Wireless intends to resume use of both SIMPLY WIRELESS and SIMPLY PREPAID." [*Id.*]

## B. T-Mobile's Use of the Mark

T-Mobile dealers began operating retail stores under the SIMPLY PREPAID name in June, 2014 and T-Mobile filed an application to register the SIMPLY PREPAID mark on August 13, 2014. [Doc. No. 209-2], DUF ¶ 15. Industry press began reporting on T-Mobile's stores in August, 2014, and, in January, 2015, T-Mobile began offering prepaid plans using the SIMPLY PREPAID mark. [Doc. No. 198], PUF ¶ 26; [Doc. No. 256], PUF Response ¶ 26. T-Mobile has continued to

---

[15] T-Mobile disputes this fact, contending that Simply Wireless fails to put forward evidence establishing that any of these sales were associated with the Mark. [Doc. No. 256], PUF Response ¶ 18.

use the Mark, earning more than ███ billion in revenues received from wireless services sold in connection with the SIMPLY PREPAID mark. [Doc. No. 198], PUF ¶ 39; [Doc. No. 256], PUF Response ¶ 39.

Simply Wireless learned of T-Mobile's plan to use the Mark in August, 2014. [Doc. No. 198], PUF ¶ 33; S. Qureshi Decl. ¶ 23. On October 2, 2014, several months after T-Mobile began using the name SIMPLY PREPAID for certain prepaid-only retail store locations, Simply Wireless applied to register SIMPLY PREPAID at the USPTO, reciting a date of first use of June 30, 2002. [Doc. No. 198], PUF ¶ 43; S. Qureshi Decl. ¶ 26, Ex. 14. The USPTO proceedings as to the parties' applications have been stayed pending resolution of this case. [Doc. No. 208-4], Ex. 77.

## II.    LEGAL STANDARD

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citation omitted)); *see also Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011) ("When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." (citation omitted)).

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material

fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."). Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III.   ANALYSIS

Plaintiff Simply Wireless has moved for summary judgment in its favor on Counts III, IV, and VI of the Complaint and on the T-Mobile Defendants' second and third counterclaims alleging abandonment of the SIMPLY PREPAID mark. Defendant T-Mobile has moved for summary judgment in its favor on all of Simply Wireless's claims.[16] In relevant part, the parties' cross-motions for summary judgment focus on the same issue: priority ownership of the Mark. Specifically, Simply Wireless moves for summary judgment on T-Mobile's affirmative defense of abandonment, [Doc. No. 198], at 25-27, and T-Mobile moves for summary judgment on the grounds that Simply Wireless cannot establish ownership of the Mark, either because of Simply

---

[16] T-Mobile has not moved for summary judgment on its counterclaims.

Wireless's lack of continuous use or, alternatively, abandonment, [Doc. No. 209-2], at 6-10, 10 n.4.[17] Because the threshold issue is whether Simply Wireless has ownership of the SIMPLY PREPAID mark under the common law, the Court first considers that issue under Count IV, alleging T-Mobile's infringement of the Mark based on Simply Wireless's common law ownership. Although both parties have moved for summary judgment in their favor as to that issue, the Court first considers that issue within the context of T-Mobile's Motion for Summary Judgment and therefore has viewed the facts, and all reasonable inferences to be drawn therefrom, in a light most favorable to Simply Wireless, the non-moving party.[18]

## A.  Trademark Infringement at Common Law (Count IV)[19]

Simply Wireless contends that by virtue of its actual first use in 2002 of SIMPLY PREPAID, which it contends is a "distinctive mark," it has priority over T-Mobile's subsequent first use in June, 2014. In response, T-Mobile argues that Simply Wireless lacks ownership of the Mark for two separate reasons: (1) Simply Wireless fails to show continuous use of the Mark from 2002 up to and until T-Mobile's first use in June, 2014; and (2) Simply Wireless had abandoned the Mark, thereby allowing T-Mobile to take ownership of the Mark and become the senior user.

---

[17] T-Mobile's brief in support of its Motion for Summary Judgment focused primarily on Simply Wireless's failure to show exclusive use in any geographic area or continuous use, but nevertheless raised the abandonment issue as well, albeit it in a footnote. T-Mobile expanded its abandonment arguments in its reply brief in support of its Motion for Summary Judgment, [Doc. No. 277], at 9-11, and its supplemental argument before the Court, [Doc. No. 332-1].

[18] Reflecting that the parties have largely incorporated both their continuous use and abandonment arguments into their respective briefing, the Court has considered the parties' arguments as presented in both their briefing in support of their respective motions for summary judgment as well as their oppositions. At bottom, in terms of abandonment, Simply Wireless moves for summary judgment, in part, on the grounds that, as a matter of law, it did not abandon the Mark while T-Mobile moves for summary judgment on the grounds that, as a matter of law, Simply Wireless did abandon the Mark.

[19] In Count III, Plaintiff brings a trademark infringement claim under Section 43(a) of the Lanham Act, which also provides protection to common law marks. *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 30 (2003) (noting that Section 43(a) "create[es] a federal cause of action for traditional trademark infringement of unregistered marks"); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). The test for Virginia common law trademark infringement is essentially the same as that under the Lanham Act. *See Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 162 (4th Cir. 2014).

As discussed below, the Court finds that Simply Wireless sufficiently established that it had engaged in "deliberate and continuous" use of the SIMPLY PREPAID Mark from 2002-2008 and therefore acquired certain common law rights in the Mark as the first or senior user of the Mark. Nevertheless, the Court concludes, as a matter of law, that Simply Wireless failed to "use" the Mark, as that term is defined in the Lanham Act, from 2009 to July, 2012, and failed to rebut the mandatory inference of intent not to resume use established by those more than three-and-a-half years of non-use. Accordingly, as a matter of law, Simply Wireless abandoned the Mark as of 2012 and it did not accrue a new protectible ownership interest through its intermittent, limited use of the Mark during a nine-month period from late-July 2012 to April 2013 or through its subsequent use.

### *Lack of Continuous Use*

The criteria for determining whether there has been "continuous use" of a common law trademark appears somewhat unclear and unsettled, particularly as to the role, if any, the doctrine of abandonment should play, and to what extent a first user can preserve its priority over a subsequent user despite periods of non-use. Nevertheless, there are settled principles that operate with respect to these issues.

As a threshold matter, "[c]ommon law determines who enjoys the exclusive right to use an unregistered trademark, the extent of such rights, and the proper geographical scope of any injunctive relief necessary to protect against the infringement of such rights." *Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 267 (4th Cir. 2003) ("*Emergency One II*") (citation omitted). At common law, "the putative owner bears the burden of establishing ownership of the disputed mark in any trademark infringement action." *Brittingham v. Jenkins*, 914 F.2d 447, 452 (4th Cir. 1990). Trademark ownership of an unregistered mark "is acquired by actual use of the

mark in a given market." *Emergency One II*, 332 F.3d at 267 (citation omitted). "To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Id.* (quoting *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)); *see also B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 142 (2015) ("One who first uses a distinct mark in commerce thus acquires rights to that mark." (citation omitted)). In light of those principles, the first user to appropriate and use a particular mark generally has priority to use the mark to the exclusion of any subsequent or junior users. *See Emergency One II*, 332 F.3d at 267 ("When more than one user claims the exclusive right to use an unregistered trademark, priority is determined by 'the first actual use of [the] mark in a genuine commercial transaction.'" (alteration in original) (citation omitted)); *see also Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015) ("Rights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users."); *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 100 (1918) ("[T]he general rule is that, as between conflicting claimants to the right to use the same mark, priority of appropriation determines the question." (citations omitted)). Despite these settled principles, T-Mobile contends that the first-in-time, first-in-right principle does not completely resolve the present dispute. Relying on Fourth Circuit precedent, T-Mobile argues that an owner of an unregistered mark must show "continuous use," *i.e.*, that the owner must show its use of the mark was "deliberate and continuous, not sporadic, casual or transitory." *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 146 (4th Cir. 1998) (quoting *La Société Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271-72 (2d Cir. 1974)).

Although it appears under Fourth Circuit precedents that an owner of a common law mark must show "deliberate and continuous use," neither the parties nor this Court have located Fourth Circuit authority clearly instructing on the meaning of "continuous," specifically, whether the first user must only show use for a substantial period of time or must show use to the present day or, at least, through the time of the subsequent user's first use. The Fourth Circuit case that has most directly delved into this issue, *Emergency One I*, analyzed the issue of continuous use based on the doctrine of abandonment, but only because the parties' pre-trial stipulations narrowed the case down to that one issue. *See Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 228 F.3d 531, 533 (4th Cir. 2000) ("*Emergency One I*"); *see also Emergency One II*, 332 F.3d at 266-67 (pronouncement regarding standard for common law priority came in the context of evaluating scope of injunction after a jury made a liability determination).

Other circuits appear to require a common law owner to establish continuous use through the date of a competing use. *See, e.g.*, *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 219 (3d Cir. 2021) ("With respect to ownership of an unregistered mark, the first party to adopt a mark can assert ownership *so long as it continuously uses* the mark in commerce." (quoting *Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000)) (cleaned up) (emphasis added)); *Airs Aromatics LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) ("To establish a protectible ownership interest in a common law trademark, the owner must 'establish not only that he or she used the mark before the mark was registered, but also that *such use has continued to the present*.'" (quoting *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005)) (emphasis added)). And T-Mobile relies on several cases that appear to support its contention that common law trademark owners must continuously use a mark in commerce in order to retain their trademark rights. For example, in *Causal Corner*, the defendant, the prior user,

14

argued on appeal that it possessed a common law right to use the disputed mark because its use of the mark began prior to plaintiff's use. *Casual Corner Assocs., Inc. v. Casual Stores*, 493 F.2d 709, 712 (9th Cir. 1974). Given that the defendant used the mark before the plaintiff, the district court concluded that "the pivotal issue [was] whether there ha[d] been a continuing use" by the defendant. *Id.* ("To be a continuing use, the use must be maintained without interruption."). On appeal, the Ninth Circuit affirmed the trial court's decision that the defendant did not establish continuing use because of a "one-year period" of "complete nonuse of the mark," and, as a result, did not have a common law right to use the mark. *Id.*

The district court in *Spin Master* took *Casual Corner* one step further, concluding that while *Casual Corner* addressed the meaning of "continuing" as used in 15 U.S.C. § 1065,[20] "there is nothing to suggest that the same rule does not apply to a common law priority claim." *Spin Master, Ltd. v. Zobmondo Entm't, LLC*, 944 F. Supp. 2d 830, 851 (C.D. Cal. 2012). The *Spin Master* court also rejected the contention that in the context of competing common law rights, the "'continuous use' requirement is tantamount to 'abandonment;'" holding that "even when only competing common law rights are at issue: the party claiming common law priority (here, [defendant]) bears the burden to show continuing use" and "requiring a showing of abandonment would shift the burden to the party challenging priority (here, [plaintiffs]) to show both a break in use and intent not to resume use." *Id.* at 851-52 ("Thus, the inquiry into common law priority is not controlled by the requirements of abandonment."); *see also Airs Aromatics*, 744 F.3d at 599-600 (requiring common law trademark owner to allege "continuous usage" in order to bring a

---

[20] Under Section 1065, a common law senior user can defend against an infringement claim brought by an owner of a registered, incontestable mark by showing that it has used, and continues to use, the mark from a date prior to the registration. 15 U.S.C. § 1065.

cognizable claim for trademark infringement and dismissing claim on that basis where plaintiff had seven years of non-use).

Simply Wireless contends that the pronouncements in *Casual Corner,* which dealt with a contest between a registered *incontestable* mark holder and an earlier user claiming common law ownership, do not apply to a priority contest between two *non-incontestable* and unregistered marks, as in this case. [Doc. No. 246] at 14. When determining the priority among non-incontestable marks, Simply Wireless argues, the first user must only establish that they have not abandoned the mark. [Doc. No. 246 at 14 (citing 15 U.S.C. § 1052(d)).][21] *Spin Master*'s conclusion to the contrary, Simply Wireless posits, relies on an incorrect application of trademark law and should be ignored. The Court substantially agrees with Simply Wireless.

Although some cases imply that a common law trademark owner must show continuous use of the mark at least up and until the junior user's first use in order to accrue and maintain their rights, that view conflicts with fundamental principles of trademark law. The Fourth Circuit's decision in *Larsen* is instructive on this point. There, the defendant (a U.S.-based distributor of plaintiff's product) attempted to argue that the plaintiff could not assert a claim under the Lanham Act because the plaintiff's "unregistered trademark" had never been "in use" in the United States. *Larsen*, 151 F.3d at 146 (noting defendant argued plaintiff's sales "were too 'sporadic' to constitute use under the Lanham Act"). Because of the defendant's counterfeiting in *Larsen*, the plaintiff did not make any additional sales into the United States for at least a period of eighteen

---

[21] Section 1052(d) provides that "No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it . . . Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, *or a mark or trade name previously used in the United States by another and not abandoned.*" 15 U.S.C. § 1052(d) (emphasis added); *see also W. Fla. Seafood, Inc. v. Jet Rests., Inc*., 31 F.3d 1122, 1128 (Fed. Cir. 1994) ("The governing statute does not speak of 'continuous use,' but rather of whether the mark or trade name has been '*previously used* in the United States by another and *not abandoned.*'" (emphasis in original) (quoting 15 U.S.C. § 1052(d)).

months and the sales of its legitimate products, facilitated by the defendant, likely ceased approximately eight to nine months before plaintiff brought suit. *Id.* at 143-44. Despite those circumstances, the Fourth Circuit rejected defendant's argument, concluding that plaintiff's earlier sale of 11,000 CDs "clearly" satisfied the Act's "in use" requirement, thereby entitling plaintiff's common law trademarks to protection. *Id.* The Court in *Larsen* did not require plaintiff to show continuous use beyond its initial sale before allowing it to recover on its unregistered trademarks. In contrast, but based on the same legal principles, the Second Circuit in *Jean Patou* determined that the defendant never even accrued protectable, common-law trademark rights through its sale of eighty-nine bottles of perfume over the course of twenty years, holding that such sales did not qualify as "bona fide usage." 495 F.2d at 1271-73. Critically, the Second Circuit's pronouncement that "the proponent of the trademark must demonstrate that his use of the mark has been deliberate and continuous, not sporadic, casual or transitory" came in the context of deciding whether the defendant accrued—not retained—trademark rights. *Id.* at 1271-72. *Jean Patou*'s discussion of abandonment further confirms that had the defendant accrued common law marks in the first instance, the proper analysis would have been abandonment, not continuous use. *Id.* at 1273 n.9 (rejecting the defendant's abandonment argument because the "issue of abandonment arises only if the defendant has *previously acquired rights in the trademark*" and the plaintiff's argument was that defendant never "established any enforceable rights" in the mark (emphasis added)). Furthermore, in *Emergency One II*, the Fourth Circuit, though not addressing the exact argument T-Mobile puts forward here, held that when "more than one user claims the *exclusive right* to use *an unregistered trademark*, priority is determined by 'the *first actual use of [the] mark* in a genuine commercial transaction.'" 332 F.3d at 267 (citation omitted) (emphasis added); *see also Blue Bell,*

*Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1265-67 (5th Cir. 1975) (awarding common law ownership in unregistered mark based on first "actual use" in trade).

Taking these decisions together, the general rule that emerges is that the "deliberate and continuous" test applies only to the initial accrual of trademark rights, not whether a common law owner has maintained such rights. Whether a common law trademark owner has retained their property rights in a mark is more properly analyzed through an abandonment analysis. This conclusion is further supported by cases in the Fourth Circuit and elsewhere that have analyzed this issue through an abandonment analysis, rather than apply a continuous use standard. *See, e.g.*, *George Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 400-01 (4th Cir. 2009) (analyzing lack of continuous use of common law, unregistered trademark infringement claim through an abandonment analysis); *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1329-30 (11th Cir. 2008) (same); *cf.* McCarthy on Trademarks and Unfair Competition ("McCarthy") § 16:9 (5th ed.) ("To establish ownership of a mark, the prior user must establish not only that at some date in the past it used the mark, but that such use has continued to the present. . . . Initial use of the mark, followed by a long period of nonuse, *may result in abandonment of whatever rights accrued to the initial usage*." (emphasis added)).[22] That approach also better aligns with the fundamental trademark law principle of first-in-time, first-in-right. *See, e.g.*, *B & B Hardware*, 575 U.S. at 142; *Hana Bank*, 574 U.S. at 419; *Emergency One II*, 332 F.3d at 267.

Accordingly, to establish common law trademark ownership of the Mark, Simply Wireless need only establish that it (1) used the Mark first and (2) that such use was deliberate and continuous, not sporadic, casual or transitory. Simply Wireless has satisfied both requirements.

---

[22] And, as noted above, the parties in *Emergency One* narrowed the issue down to abandonment through pre-trial stipulations. Presumably, if lack of continuous use could defeat common law ownership, American Eagle would have sought to prevail on that less burdensome ground. *Emergency One I*, 228 F.3d 531.

The summary judgment records shows, upon drawing all inferences in favor of Simply Wireless, that Simply Wireless first used the SIMPLY PREPAID mark in 2002—more than twelve years before T-Mobile. And, from 2002 to 2008, Simply Wireless owned and maintained the domain name, www.simplyprepaid.com, offering pre-paid airtime for cell phones, [Doc No. 198], PUF ¶¶ 4, 9; S. Qureshi Decl., ¶¶ 4, 9, Ex. 5, during which time, Simply Wireless earned more than $20 million in revenue through its use of the SIMPLY PREPAID mark.  [Doc. No. 198], PUF ¶ 5; S. Qureshi Decl. ¶ 5, Ex. 2; [Doc. No. 209-11], Ex. 29. Therefore, Simply Wireless accrued common law ownership rights in the Mark and therefore may be divested of those rights only through its abandonment of the Mark.

### Abandonment

Simply Wireless did not use the SIMPLY PREPAID mark in commerce for over three-and-a-half years, from 2009 to July 31, 2012, thereby triggering the presumption of abandonment. *See* 15 U.S.C. § 1127 ("Nonuse for 3 consecutive years shall be prima facie evidence of abandonment"); *Emergency One I*, 228 F.3d at 535-36 ("Non-use [of a mark] for three consecutive years" creates "a mandatory inference of intent not to resume use") (citation omitted)). Once triggered, Plaintiff bore the burden of "producing evidence of either actual use during the relevant period or intent to resume use" to rebut the presumption. *Id.* at 536. Because Simply Wireless did not use the mark for more than three years, it can only rebut the presumption by establishing that it had formed an intent to resume use in the reasonably foreseeable future during the three-year statutory period. [23]

---

[23] Plaintiff argues it did engage in actual use of the mark by displaying a SIMPLY PREPAID mark at its Virginia headquarters. That type of promotional use is not the "use required to preserve trademark rights under the Lanham Act." *Emergency One I*, 228 F.3d 535 (rejecting party's claim that its "continued [usage of] the mark on clothing and promotional merchandise" was sufficient to establish actual use to rebut a claim of abandonment).

In rebutting the statutory presumption of abandonment, Simply Wireless faces a burden of production, not persuasion. *See id.* at 536; *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 148 (2d Cir. 2007) ("The significance of a presumption of abandonment is to shift the burden of production to the mark owner to come forward with evidence indicating that, despite three years of non-use, it intended to resume use of the mark within a reasonably foreseeable time." (citation omitted)). The trademark holder's "intent to resume use in commerce must *be formulated within* the three years of nonuse." *Specht v. Google Inc.*, 747 F.3d 929, 934 (7th Cir. 2014) (emphasis added) (citations omitted); *see also ITC*, 482 F.3d at 149 n.9. And the intent must be to "use the mark in the reasonably foreseeable future." *Emergency One I*, 228 F.3d at 537 ("Of course, what is meant by the 'reasonably foreseeable future' will vary depending on the industry and the particular circumstances of the case. . . . [I]t might be reasonable for a fire truck manufacturer to spend five or six years considering the reintroduction of a brand, even though the same passage of time would be unreasonable for a maker of a more ephemeral product, say potato chips." (internal citation omitted)).[24] Thus, Simply Wireless must come forth with evidence showing that during the three-year period from 2009-2011, it had formulated the intent to resume use of the SIMPLY PREPAID mark in the reasonably foreseeable future.

Courts generally hold that a trademark owner "cannot defeat an abandonment claim, as well as the purposes of the Lanham Act, by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date," *id.* at 537; *see also ITC*, 482 F.3d at 150, because "[i]n every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest," *Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d. 1575,

---

[24] "Requiring the owner to have an intent to use the mark in the reasonably foreseeable future ensures that valuable trademarks are in fact used in commerce as the Lanham Act intends, rather than simply hoarded or warehoused." *Id.*

1581 (Fed. Cir. 1990). Therefore, the mark owner must produce more than vague and subjective testimony. For instance, in *Emergency One*, the senior user of the common law mark satisfied its burden of production by offering the following evidence: (1) continuous promotional use of the mark on hats, T-shirts, tote bags, and souvenir nameplates; (2) testimony from executives that they "actively considered using" the mark on firetrucks during the three-year non-use period (1992-95); and (3) a business plan formulated during the statutory period of non-use that identified the disputed mark as one of four potential brand names for a new line of firetrucks and corroborated the executives' testimony. *Emergency One I*, 228 F.3d at 537 (noting, also, that the senior user "paid a substantial sum of money" for the disputed mark "only a few years earlier"). Similarly, in *Crash Dummy*, the junior user claimed that the senior user abandoned the marks by not using the marks for more than six years. *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010) (noting that the senior user acquired marks in February 1997 through an assignment but did not begin selling toys using the mark until December 2003). The senior user, however, successfully defeated the abandonment claim by showing an intent to resume use within the contested time period by establishing that it (1) entered into discussions in 1998 with a retailer regarding a potential deal involving toys with the disputed marks; (2) contemplated manufacturing toys under the marks at the time of those 1998 discussions; and (3) recorded the trademark assignment with the USPTO in 1998. *Id.* at 1391.[25]

  As evidence of its intent to resume the use of the Mark sufficient to preclude a finding of abandonment as a matter of law, Simply Wireless points to (1) its annual renewal of the

---

[25] Additionally, the senior user proffered evidence from outside the statutory period also evincing an intent to resume use in the foreseeable future, namely the senior user (1) began "brainstorming ideas" for toys with the marks in 2000; (2) researched and tested the toys in 2001, and obtained concept approval in 2002; and (3) began manufacturing the toys in 2003. *Id.* at 1391-92; *id.* at 1392 (noting that a court "may consider evidence and testimony regarding Mattel's practices that occurred before or after the three-year statutory period to infer Mattel's intent to resume use during the three-year period").

simplyprepaid.com domain; (2) discussions it had, beginning in 2011, with Ignite Media—an online retail promotional company—about selling cellular phones and airtime via toptvstuff, and its subsequent actual use of the Mark on toptvstuff beginning in July 2012; and (3) the declaration from its CEO submitted in opposition to T-Mobile's motion for summary judgment that Simply Wireless always intended to resume use of the Mark.

As for the domain renewal, the simply prepaid website remained completely dormant from 2009 to 2014; and merely renewing a domain name for a website without any functionality does not sufficiently indicate an intent to resume use of the Mark in the reasonably foreseeable future. *See Specht v. Google, Inc.*, 758 F. Supp. 2d 570, 593 (N.D. Ill. 2010) (concluding plaintiff's maintenance of a "ghost site[,]" "a functional yet almost purposeless website," could not "prevent abandonment of a mark"), *aff'd*, 747 F.3d 929 (7th Cir. 2014).

Regarding the toptvstuff negotiations, the testimony and evidence surrounding the use of the SIMPLY PREPAID mark is of a vague and indefinite nature. For example, Steven Qureshi states in his declaration that Simply Wireless "never intended to abandon SIMPLY PREPAID," "always intended to resume use of the SIMPLY PREPAID trademark," and "continuously sought business opportunities for using SIMPLY PREPAID." S. Qureshi Decl. ¶ 10. In support of that declaration, Qureshi references negotiations with Ignite Media beginning in 2011 that "focused on the use of the SIMPLY PREPAID mark." *Id.* ¶ 11. But the referenced communications with Ignite Media are either outside the statutory period (July 2012) or fail to mention the Mark at all (January 2011), *id.*, Ex. 6,  and do not reflect a formulated intent to resume use of the Mark in the reasonably foreseeable future. Likewise, other contemporaneous emails between Ignite Media and Simply Wireless fail to reflect an actual, already formed intent to resume use of the Mark. For instance, on August 20, 2012, a date outside the three-year window, Brian Westrick of Ignite Media emailed,

among others, Steve Qureshi an "initial testing budget" for the use of the Mark on toptvstuff, which reflects not only that negotiations regarding the Mark did not begin in earnest until well into 2012, after the presumption of abandonment had accrued, but also that they were only preliminary, exploratory efforts in the nature of an experiment, to determine whether to engage in any future use of the Mark. *See* S. Qureshi Decl., Ex. 8 at SW070261 ("[W]e wont [sic] 'make money' in the short run [but] we will generate some good learnings and move the program further toward its goal. Online marketing is very much about testing, learning, optimizing and doing it all over etc."). Later emails also reflect the experimental nature of Simply Wireless's potential use of the Mark, as it was only one of several names being considered for a new website during the preliminary planning taking place as of June, 2014, long after the three-year statutory presumption of abandonment had accrued. *See* S. Qureshi Decl., Ex. 9. Unlike in *Crash Dummy* or *Emergency One*, Simply Wireless has offered no evidence that any delays in resuming use of the Mark was within the context of a definite plan to resume use of the Mark sooner. *See Crash Dummy*, 601 F.3d at 1390 (noting senior user declined to pursue retailer option because it "needed to retool" the toys carrying the Mark to meet its "stringent safety standards"); *Emergency One I*, 228 F.3d at 537 (noting senior user's delay in reintroducing firetruck carrying the Mark was to "avoid duplication" and also due to "skittishness after an embarrassing experience introducing another brand").[26] While there was a purported industry-wide shift in the market away from prepaid airtime, Simply Wireless does not explain why or how that shift impacted its ability to use the

---

[26] Additionally, Simply Wireless's actual use of the Mark, beginning at the end of July, 2012 (nearly eight months after the three-year statutory period ended), was not through the simply prepaid website—which remained dormant until late 2014—but rather a third-party platform, toptvstuff. And its subsequent use of the Mark through toptvstuff substantially differed from its offerings on the simply prepaid website: Simply Wireless previously used the Mark in connection with the sale of "prepaid airtime," [Doc. No. 198], PUF ¶ 4, Simply Wireless's new product offering on toptvstuff mainly consisted of cellphones with a few bundled offerings of cellphones and prepaid airtime. [Doc. No. 333-1], Pl. Slides at 10; S. Qureshi Decl., Ex. 7.

Mark sooner or what it was doing during the three-year statutory period of non-use to determine if and how to use the Mark in the new business landscape.

Even after taking into account a substantially broader view of Simply Wireless's post-statutory presumption period activity, Simply Wireless has failed to produce sufficient evidence of an intent to resume use formulated during the three-year statutory period. *See Crash Dummy*, 601 F.3d at 1392 (noting that courts can "consider evidence and testimony regarding practices that occurred before or after the three-year statutory period to infer [senior user's] intent to resume use during the three-year period"). Since 2012, Simply Wireless's use of the Mark has been sporadic, causal, and transitory. After earning a combined total of slightly more than $15,000 in sales in 2012 ($14,669) and 2013 ($877), Simply Wireless did not use the Mark again in commerce until after it learned of T-Mobile's use. Thereafter, Simply Wireless earned approximately $1 million through sales on Amazon Marketplace purportedly associated with the Mark—the first sale of which did not occur until October, 2015. *See* S. Qureshi Decl., Ex. 2 at PageID# 4785; [Doc. No. 209-11], Ex. 29.[27] But despite this ostensible success in selling on Amazon, Simply Wireless has earned nothing through Amazon as of 2017. [Doc. No. 209-11], Ex. 29. Relatedly, its sales through the revamped simply prepaid website, relaunched in 2014, were paltry at best, earning no sales in 2014 or 2015, and only earning a combined total of approximately $7,000 over a three-year period: 2016 ($3,819.44), 2017 ($2,653.99), 2018 ($589.50). [*Id.*] It is also undisputed that Simply Wireless once again completely stopped using the Mark as of 2019, having not made any sales as of March 31, 2018. Beginning in 2019, Simply Wireless again let the simply prepaid website lay dormant for several years, only to resurrect with a "Coming Soon" banner after the present

---

[27] *But see* [Doc. No. 208-1], Ex. 24 (S. Qureshi Dep. Tr.) at 174:15-19 ("Q. I want to focus on the advertising. Were any of the products advertised [on Amazon Marketplace] advertised as Simply Prepaid products and services in the actual product name? A. They may have been. I do not know exactly.").

litigation commenced. [Doc. No. 277], at 11 n.7; https://simplyprepaid.wpcomstaging.com (last visited Oct. 24, 2022) ("Simply Wireless is proud to announce the return of Simply Prepaid coming in 2022"). Simply Wireless again points to its (1) renewal of the simply prepaid website domain and (2) its CEO's declaration that it "intends to resume use of . . . SIMPLY PREPAID," S. Qureshi Decl. ¶ 22, but neither reflect its intent to resume use either during or after the statutory presumption period as a matter of law.

Nor does Simply Wireless's commencement of this lawsuit reflect an intent to resume use. *See, e.g., Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir. 1992) ("A lawsuit, without more, is not sufficient of itself to overcome a claim of abandonment."); *PBI Performance Prods., Inc. v. Norfab Corp.*, 514 F. Supp. 2d 725, 729 n.3 (E.D. Pa. 2007) ("[Plaintiff] does suggest that the filing of the instant lawsuit should be taken as evidence that it has not intended to abandon the '268 trademark. The filing of a lawsuit, however, is only an indication that the plaintiff intends to protect its rights to the trademark, not that the plaintiff intends to *resume use of the mark*." (emphasis in original)); McCarthy § 17:11 ("Ordinarily, a lawsuit against an infringing user is not a sufficient excuse for failure to use a mark. A lawsuit does not substitute for the required use of the mark in the marketplace."). Although filing a lawsuit may evince an intent not to abandon, an intent not to abandon is not equivalent with an intent to resume use in the reasonably foreseeable future. *See, e.g., Exxon Corp. v. Humble Exploration Co., Inc.,* 695 F.2d 96, 102-03 (5th Cir. 1983) ("There is a difference between intent not to abandon or relinquish and intent to resume use in that an owner may not wish to abandon its mark but may have no intent to resume its use. . . . An 'intent to resume' *requires the trademark owner to have plans to resume commercial use of the mark.* Stopping at an 'intent not to abandon' tolerates an owner's protecting a mark with

neither commercial use nor plans to resume commercial use. Such a license is not permitted by the Lanham Act.") (emphasis added)).

After viewing the facts in the light most favorable to Simply Wireless, the Summary Judgment records shows that while Simply Wireless may have used the Mark since 2008, its use has been sporadic, causal, and transitory, often in connection with different product offerings and sales platforms. Simply Wireless's one and only use before T-Mobile began using the Mark took place over a barely nine-month period, after the three-year period, and was largely an experimental enterprise that Simply Wireless did not pursue with any continuous commercial utilization.[28] Following that ostensibly unsuccessful exploratory experiment, Simply Wireless did not again begin using the Mark until *after* it learned of T-Mobile's use. And those uses were likewise episodic and not followed up with any continuous commercial utilization; instead Simply Wireless frequently shut down those efforts after a relatively short period of time. Thereafter, Simply Wireless completely ceased all use of the Mark as of 2019. Over this entire fourteen-year period interspersed with sporadic use, Simply Wireless has proffered only vague and indefinite plans which are insufficient as a matter of law to establish the required intent to resume use within the reasonably foreseeable future. *See Emergency One I*, 228 F.3d at 537 ("[T]he owner of a trademark cannot defeat an abandonment claim, as well as the purposes of the Lanham Act, by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date.").

For the above reasons, Simply Wireless has failed as a matter of law to produce sufficient evidence that would allow a reasonable factfinder to conclude that Simply Wireless formed the

---

[28] Even accepting Simply Wireless's claim that the SIMPLY PREPAID mark through advertisements and other promotional materials, reached approximately 500,000 consumers in all 50 states, [Doc. No. 198], PUF ¶ 13; S. Qureshi Decl. ¶ 13, that occurred during the same nine-month period and there is no evidence that Simply Wireless continued to follow up with this promotional outreach after April 2013.

intent to resume use of the SIMPLY PREPAID mark during the statutory three-year period of non-use (2009-2011), s*ee Specht*, 747 F.3d at 934, and that such resumption would be in the reasonably foreseeable future, *Emergency One I*, 228 F.3d at 537.

Having concluded that Simply Wireless abandoned the Mark by the very beginning of 2012—through its three years of nonuse (2009, 2010, and 2011)—the issue then is whether its subsequent use re-established its common law ownership. It did not. Once Plaintiff abandoned SIMPLY PREPAID, its subsequent use of the mark in 2012 and 2013 was not the kind of continuous, uninterrupted use necessary to revive its now lost rights in the mark. *See* McCarthy § 17:3 ("Rights lost as a result of abandonment are not revived by such subsequent use. Once a period of nonuse results in abandonment, a resumption of use thereafter cannot cure the preceding abandonment." (footnote omitted)). Although some sales may allow an owner to accrue common law trademark ownership rights, it must be followed by "continuous commercial utilization." *Allard Enters., Inc. v. Advanced Programing Res., Inc.*, 146 F.3d 350, 358 (6th Cir. 1998) (quoting *Blue Bell*, 508 F.2d at 1265). Nearly all of Simply Wireless's experimental sales occurred in 2012, with less than $900 worth of sales made in 2013, before completely ending by April 2013. Other than advertising at one event, Simply Wireless made no use of the Mark until 2015, many months after learning of T-Mobile's use of the Mark. Accordingly, for the reasons outlined above, Plaintiff's use in 2012 and 2013 was insufficient to establish a new protectible interest in the SIMPLY PREPAID mark.

For the above reasons, the Court will grant summary judgment in favor of Defendants on Count IV.

B.  Trademark Infringement under the Lanham Act and Virginia Code § 59.1-92.12
(Counts I, II, and III)

Simply Wireless's Counts I and III concern trademark infringement under the Lanham Act;

Count II is a claim of trademark infringement under Virginia Code § 59.1-92.1. These counts may

be considered together, because "[t]he test for trademark infringement and unfair competition

under the Lanham Act is essentially the same as that for common law unfair competition under

Virginia law." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930

n.10 (4th Cir. 1995). To establish trademark infringement under the Lanham Act, Simply Wireless

must prove four elements: (1) it owns a valid mark; (2) T-Mobile is using a similar mark in

commerce without Simply Wireless's authorization; (3) T-Mobile's use is in connection with the

"sale, offering for sale, distribution, or advertising" of goods or services; and (4) T-Mobile's use

of the mark is likely to cause confusion. *Nationstar Mortgage, LLC v. Ahmad*, 155 F. Supp. 3d

585, 589 (E.D. Va. 2015) (citing 15 U.S.C. §1114(a)); *Rosetta Stone, Ltd. v. Google, Inc.*, 676

F.3d 144, 152 (4th Cir. 2012).

Critical to claims of trademark infringement under the Lanham Act and the Virginia Code

is ownership of a mark. Here, Simply Wireless never registered the SIMPLY PREPAID mark

before T-Mobile's first use or its own registration application, which, if Simply Wireless had,

would have granted Simply Wireless a presumption of ownership. *George & Co. LLC*, 575 F.3d

at 400 n.15 ("[F]ederal registration is *prima facie* evidence that the registrant is the owner of

the mark.") (citing 15 U.S.C. § 1057(b)). And, for the reasons stated above concerning common

law ownership, Simply Wireless cannot otherwise show that it owns the mark, which precludes

these claims. Accordingly, the Court will grant summary judgment in favor of Defendants on

Counts I, II, and III.

C.   <u>Trademark Dilution under the Lanham Act (Count V)</u>

Simply Wireless has abandoned its dilution claim. *See* [Doc. No. 246] at 23 n.11. The Court

will therefore enter judgment in favor of Defendants on Count V.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that Defendants' Motion for Summary Judgment [Doc. No. 189] be, and the

same hereby is, GRANTED as to Counts I, II, III, IV, and V and that judgment be, and the same

hereby is, ENTERED in Defendants' favor on those Counts; and it is further

ORDERED that, having found Simply Wireless cannot show ownership of the Mark as a

matter of law, Plaintiff Simply Wireless, Inc.'s Motion for Summary Judgment [Doc. No. 184] be,

and the same hereby is, DENIED; and it is further

ORDERED that within ten (10) days of the date of the Under Seal Memorandum Opinion

and Order [Doc. No. 337], the parties file their respective positions concerning the appropriate

scope of relief, if any, with respect to Counts I, II, and III of T-Mobile's Counterclaim in light of

the Court's decision herein; and it is further

ORDERED that Plaintiff Simply Wireless, Inc.'s (1) Motion to Exclude the Expert Report

and Testimony of Dr. Naomi Baron, Ph.D. [Doc. No. 180]; (2) Plaintiff Simply Wireless, Inc.'s

Motion to Exclude the Expert Report and Testimony of Theodore Moon [Doc. No. 181]; (3)

Plaintiff Simply Wireless, Inc.'s Motion to Exclude the Surveys and Testimony of Hal Poret and

Philip Johnson [Doc. No. 182]; (4) Plaintiff Simply Wireless, Inc.'s Motion to Exclude the Expert

Report and Testimony of Shirley Webster [Doc. No. 183]; (5) Defendants' Motion to Exclude the

Expert Opinions of Mr. Terry Hsu [Doc. No. 185]; (6) Defendants' Motion to Exclude the Expert

Opinions of Dr. Simon Blanchard [Doc. No. 186]; (7) Defendants' Motion to Exclude the Expert

Opinions of Dr. Natalie Schilling [Doc. No. 187]; and (8) Defendants' Motion to Exclude the Expert Opinions of Mr. Todd W. Schoettelkotte [Doc. No. 188] be, and the same hereby are, DENIED as moot; and it is further

ORDERED that Plaintiff's Motion for Leave to File Hearing Slides and Supplemental Authority [Doc. No. 312] and Defendants' Motion for Leave to File Sur-Reply in Opposition to Plaintiff's Motion for Leave to File Hearing Slides and Supplemental Authority [Doc. No. 327] be, and the same hereby are, GRANTED.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.[29]

Anthony J. Trenga
Senior U.S. District Judge

November 1, 2022
Alexandria, Virginia

---

[29] On October 24, 2022, because the Court relied on the parties' sealed filings in reaching its decision, the Court issued this same Memorandum Opinion and Order under seal. [Doc. No. 337]. Accordingly, the Court directed the parties to propose any redactions within seven (7) days. The parties complied, proposing only minimal redactions [Doc. No. 338-1], which the Court incorporates herein. No other changes have been made to this Memorandum Opinion and Order other than to remove the instructions pertaining to the sealed version of the Memorandum Opinion and Order.